Estate of William G. Tankoos, Deceased, Elizabeth B. Tankoos, S. Joseph Tankoos, Jr., and Townsend M. McAlpin, Executors and Elizabeth B. Tankoos, Individually v. Commissioner.
Estate of Tankoos v. Comm'r
Docket No. 3290-63. United States Tax Court
T.C. Memo 1967-8; 1967 Tax Ct. Memo LEXIS 252; 26 T.C.M. (CCH) 50; T.C.M. (RIA) 67008; January 23, 1967
*252 Held: That respondent's deficiency determination was not arbitrary and unreasonable. Held, further: That respondent's disallowance of certain business expenses claimed by a real estate partnership in the amount of $39,597.50 is sustained to the extent of $30,229.67. Held, further: That respondent's disallowance of certain unreimbursed business expenses claimed by William G. Tankoos in the total amount of $1,200 is sustained. William E. Murray and Jerome R. Rosenberg, for the petitioners. Marie L. Garibaldi and John J. Madden, for the respondent. HOYT
*253 Memorandum Findings of Fact and Opinion HOYT, Judge: Respondent determined a deficiency of $5,403.15 in income taxes of the petitioners for 1959. A preliminary issue is whether respondent's deficiency determination was arbitrary and unreasonable. The primary issues in dispute are whether respondent correctly determined that certain business expenses in the total amount of $39,597.50 were not allowable as deductions in computing the net ordinary income of Tankoos & Company and whether respondent correctly disallowed $1,200 of business promotion and travel expenses deducted by William G. Tankoos. Findings of Fact Some of the facts have been stipulated and are found accordingly and adopted as our findings. The petitioners are the Estate of William G. Tankoos and Elizabeth B. Tankoos, individually, the widow of William G. Tankoos. William G. Tankoos ("William") and petitioner, Elizabeth B. Tankoos, filed a joint income tax return for the year involved with the district director of internal revenue, Manhattan District, New York. William died on February 19, 1963, and Elizabeth B. Tankoos, S. Joseph Tankoos, Jr. ("Joseph"), and Townsend M. McAlpin were appointed as executors of *254 his estate. In 1959 William and Joseph were the sole partners in Tankoos & Company which was a partnership located in New York, New York, engaged in the real estate business. William and Joseph were brothers, and each had a one-half interest in Tankoos & Company. Tankoos & Company had a total income of $123,694.44 in 1959 and claimed total deductions of $116,781.53, leaving as ordinary income the sum of $6,912.91. William and Joseph reported income from Tankoos & Company in the amounts of $3,456.45 and $3,456.46, respectively, in their 1959 income tax returns. Set forth below is a list of the expenses claimed as deductible business expenses in the 1959 income tax return of Tankoos & Company, which are in issue, and the amount of such claims which were allowed and disallowed by respondent: Claimed
Allowed
Disallowed
Advertising and Publicity
$36,691.72
$18,691.72
$18,000.00
Traveling and Fares
22,164.67
5,164.67
17,000.00
Telephone and Telegraph
9,263.13
6,263.13
3,000.00
Dues and Subscriptions
3,959.64
2,362.14
1,597.50
$72,079.16
$32,481.66
$39,597.50
William's share of the redetermined partnership income was *255 increased by respondent in the amount of $15,597.50. [1] The amount of the claimed expenses has been substantiated, so that the only question is whether such expenses were ordinary and necessary trade or business expenses deductible as such by Tankoos & Company. Tankoos & Company was formed in 1950 or 1951 by William and Joseph. Their father, Samuel J. Tankoos, had been a leading figure in the real estate business in New York City for many decades prior to his death in 1949. The brothers had been employed for several years by the continuation of their father's firm prior to forming Tankoos & Company. A substantial number of the clients of Tankoos & Company had been clients of Samuel J. Tankoos. The real estate business of Tankoos & Company fell into two categories. William was responsible for the leasing and brokerage activities of the firm in the metropolitan New York area. Most of this business resulted from chain store accounts. Joseph devoted his efforts in the partnership to "new business" which involved brokerage activities in connection *256 with programs of investment purchases and sales, financings, and syndications. This aspect of the business of Tankoos & Company extended beyond the limits of the New York metropolitan area. In 1959 Tankoos & Company, through Joseph's efforts, was involved in activities in Florida, Canada, and Venezuela. The activities of Tankoos & Company relating to properties in Canada were carried out jointly with Tankoos-Yarmon, Limited, a Canadian corporation. William and Joseph each owned 25 percent of the stock of Tankoos-Yarmon, Limited. Elliot Yarmon owned the remaining 50 percent and was president of the company. Tankoos & Company, as United States co-broker or correspondent for Tankoos-Yarmon, Limited, obtained investors and purchasers in the United States for the properties located or developed by the Canadian firm. Tankoos & Company shared equally with Tankoos-Yarmon, Limited, the commissions earned in connection with certain Canadian activities. Tankoos-Yarmon, Limited, had gross receipts of $188,359.79 in its fiscal year ended November 30, 1959, and net earnings after expenses and before income taxes of $9,953.76 that year. It incurred only $2,904.59 for entertaining expenses that *257 year. The business and revenues of Tankoos & Company were primarily dependent upon the personal contacts of its partners with customers, potential customers, other brokers, owners, investors, and other persons in the real estate field. William entertained executives of chain-store clients, owners of properties being leased or to be leased to the chain-store clients, prospective purchasers and sellers of properties, bankers, and others involved in the metropolitan New York activities of the firm. Joseph entertained prospective investors, sellers, brokers, and others interested in the purchase, financing, and sale and lease-back programs put together by Tankoos & Company in Florida, Canada, Venezuela, and other areas outside of New York. Tankoos & Company claimed a deduction of $36,691.72 for advertising and publicity expenses during 1959 and respondent disallowed $18,000 of this amount. Included in the advertising and publicity expenses claimed by Tankoos & Company were amounts for the entertainment of and gifts to clients, prospective clients and other business associates and others. Entertainment expenditures included the cost of operating a yacht and the cost of food, drink, *258 lodging and admission to theatrical performances. The following list is a partial breakdown of the amounts spent by Tankoos & Company on various items which petitioners classified as advertising and publicity expenses: Hotels, Restaurants, American Ex-
press and Diner Club
$16,559.53
Boat Expenses
2,819.82
Clubs and Associations
3,331.55
Flower Stores
503.16
Camera Stores
1,253.61
Liquor Stores
3,422.63
Theater tickets
2,049.05
Drug Stores
440.38
Stores (except drug, liquor, flower,
or camera)
1,253.23
Cigars
289.10
Cash and reimbursements to part-
ners
2,626.27
Miscellaneous automobile expenses
457.11
Meat Market
71.80
T. V. Guide
5.00
Southern New England Telephone
Co.
32.86
TOTAL
$35,115.10
William had a heart condition during 1959 which limited his activities. As a consequence of this heart condition, William infrequently engaged in personal entertaining. William usually entertained and attended social functions for business reasons only. Since he was unable to participate in active sports and traveling was difficult, William did almost all after-hours business entertaining required of him during the summer months *259 on his 36-foot yacht, the "Tankfull III." The yacht was moored at the Stamford Yacht Club not far from William's residence at Darien, Connecticut. In 1959 total operating, mooring, and maintenance expenses in the amount of $6,467.23 were incurred in connection with the yacht and paid by Tankoos & Company. Of this amount, $360 represents the dues for the Stamford Yacht Club. All of these expenses were deducted as business expenses of the partnership in one category or another. William kept a record in the log of the "Tankfull III" of all the people who came aboard his yacht. Everyone who came aboard was considered a guest, including the children of William and Joseph. Most of the business guests on "Tankfull III" were officers of the various chain-store clients of Tankoos & Company. In 1959, however, 47 percent of the yacht's running time was incurred when no guests were aboard; 70 percent of the time there were either no guests aboard or one or more of William's children was along. A substantial amount of the use of "Tankfull III" by William was for personal reasons and personal or family pleasure. The pace of Joseph's business life in 1959 was such that almost all of his social *260 activities were connected with business or conducted with business associates, past, present, or prospective. The entertaining done by Joseph in 1959 generally had a business purpose and involved clients, prospective clients, or other business associates. However, as will be hereinafter indicated, it is by no means certain what the business purpose was on many occasions. Joseph devoted most of his time to the business of Tankoos & Company and certain other real estate activities. He was actively engaged in several business enterprises other than Tankoos & Company during 1959. These corporations and ventures had extensive real estate dealings primarily in Canada, but also in Florida, Venezuela, and Paris. In 1959 Joseph and Elliot Yarmon each owned 50 percent of the stock of Bisley, Limited, and Onslow Investments, Limited, two corporations incorporated in the Bahamas. These corporations had the following interests: Bisley, Limited 1. Wholly owned subsidiary companies International Hotels, Inc. Ennismore Investments, Limited 2. Partly owned companies Edicaficaciones Petroleras (Edi. Pet.) Sopar S. A.
Onslow Investments, Limited
1. Wholly owned subsidiary companies Trinity *261 Investments, Limited (commenced operations on July 3, 1959) Wigmore, Limited 2. Partly owned companies Parim S. A. Copas S. A. The activities of these companies during 1959 are somewhat obscured by vague testimony and incomplete financial data introduced into evidence. [2] However, certain major real estate transactions occurred in 1959 which, on a transactional basis, resulted in the following profits to the involved companies: Bisley, Limited
$ 68,626.05
(Oilbank Transaction)
Onslow Investments, Limited
987,579.99
(Anglo American Bldg. Transaction)
Trinity Investments, Limited
164,745.13
(Derrick BuildingTransaction)
The preceding transactions involved Canadian properties and required extensive and complex negotiations. Bisley, Limited, Onslow Investments, Limited, and Trinity Investments, Limited, had earned surpluses on December 31, 1959, of $395,038.16, $997,550.26 and $139,546.24, respectively. Operating expenses *262 in 1959 for these companies were nominal, and in no instance were costs of entertaining reflected in the financial reports as expenses. Tankoos & Company received income of $57,351.56 in 1959 from various properties in Canada and from commissions shared with Tankoos-Yarmon, Limited. The expenses of entertainment of customers and prospective customers by Joseph relating to joint projects with Tankoos-Yarmon, Limited, were charged to Tankoos & Company when the entertainment took place in New York, and Tankoos-Yarmon, Limited, when the entertainment took place in Canada. As previously noted, Tankoos-Yarmon expended only $2,900 for entertaining in its 1959 fiscal year. International Hotels, Inc., a wholly owned subsidiary of Bisley, Limited, was incorporated in Florida during May 1959. Its principal activity was operating the Colony Hotel in Palm Beach, Florida. During the last six months of 1959, Joseph was president and a director of International Hotels, Inc. Joseph made 20 trips to Palm Beach and spent a total of 84 days there in 1959. At least $2,900 of the amounts listed as advertising and publicity expenses of Tankoos & Company during 1959 were incurred in connection with Joseph's *263 visits to Palm Beach. The only revenues Tankoos & Company received from Palm Beach transactions in 1959 were brokerage commissions from the Royal Poinciana Plaza shopping center in the amount of $3,903.62. In 1959 Joseph made three trips to Venezuela spending a total of 13 days in that country. Edi. Pet. was erecting an office building (Centro Miranda) in Maracaibo, Venezuela. This company was owned partially by Bisley, Limited. Tankoos & Company received commissions of $5,550 from activities in Caracas, Venezuela, during 1959, but no commissions were attributable to the Centro Miranda building or activities in Maracaibo. Joseph was a director of Edi. Pet. and listed on the building brochure as the New York rental agent. In 1959 Parim S.A. and Copas S.A., partly owned companies of Onslow Investments, Limited, were engaged in construction activities in Paris. Sopar S.A., partly owned company of Bisley, Limited, was a joint venture which constructed cooperative apartments in Paris. In 1959 Tankoos & Company earned no income from any source in London, England, Paris, France, Zurich, Switzerland, or Nassau, Bahamas. Yet in 1959, Joseph made two trips to London, remaining in that *264 city for 11 days; four trips to Paris, remaining in that city for 20 days; one trip to Nassau, remaining in that city for one day; and one trip to Zurich, remaining in that city for two days. When Joseph was out of town he was reimbursed for out-of-pocket expenses by Tankoos & Company. In 1959 Tankoos & Company paid the total sum of $5,200 for the benefit of Joseph's out-of-town daily expenses or an average of $31 a day. Joseph customarily recorded the names of people he met and entertained while in New York in his diary. During 1959 Joseph met with and entertained many individuals who were closely connected with various aspects of his many business interests and enterprises other than Tankoos & Company. These expenses were paid by Tankoos & Company. Joseph testified that Tankoos & Company benefited from certain of these expenses due to the fact that many of the individuals were also connected with the business of Tankoos & Company. However, Joseph could not recall the subject of conversation with any given individual at any specific time in 1959. The records kept by Tankoos & Company were also inadequate to reveal what was discussed at the many meetings which might not have been *265 concerned with activities of Tankoos & Company. Joseph admitted in his testimony that the Bahamian companies never paid for any entertainment in New York. Tankoos & Company paid telephone and telegraph bills of $9,263.13 in 1959. Respondent disallowed $3,000 of this amount. Of the total amount spent, $4,857.56 represented charges for toll calls out of town. Many of these were to Canada, South America, Nassau, and Palm Beach. Joseph could not recall the person with whom he talked or the subject of conversation in connection with any of the calls, but he stated that they were all business calls. In carrying on their cobrokerage arrangement as to operations and transactions in Canada, Tankoos & Company and Tankoos-Yarmon, Limited, allocated expenses in connection with their joint activities between the two firms. Telephone calls and telegrams relating to operations and projects in which both firms stood to receive a commission were charged to the originating office. In 1959 Tankoos-Yarmon, Limited, paid $6,934.71 for telephone and telegraph costs. Some telephone and telegraph expenses of Tankoos & Company related to operations of the Colony Hotel in Florida. Reimbursement for these *266 expenses was not obtained because Joseph thought that payment of telephone and telegraph expenses by the Colony Hotel relating to Tankoos & Company business in an estimated approximately equal amount was a fair apportionment system. Tankoos & Company paid $22,164.67 for traveling and fares during 1959. Respondent disallowed $17,000 of this amount. Within the preceding category of expenses, Tankoos & Company spent $10,823.25 for the renting of cars. In addition, William was given a $1,800 credit for the operation of his car while allegedly engaged in business activities. [3] In carrying out his responsibilities for the brokerage and leasing activities of Tankoos & Company within the metropolitan New York area, William was required to travel about the area extensively in order to inspect properties, show sites to prospective purchasers, and to attend meetings. He incurred daily charges for taxis in New York which he paid for personally and which he deducted in his 1959 income tax return. He was not able to use trains or the subway to commute to work because of his heart condition and so he drove from Connecticut to New York daily. *267 Joseph rented cars for business purposes while in New York City and Florida. Tankoos & Company paid miscellaneous automobile expenses in the amount of $2,094.92 during 1959. At least $2,800 of the travel and fare expenses were incurred in connection with Joseph's trips to and activities in Florida. Tankoos & Company also made use of a limousine service. This service was used during the day to inspect sites and visit the offices of clients and to transport William and Joseph to and from airports and train terminals in connection with business trips. The limousine service was used in the evening to transport clients and business associates in connection with the business entertainment conducted by Joseph. It was also used by various members of the Tankoos family from time to time and by friends of the Tankoos brothers. On numerous occasions William used a limousine to commute between his home in Connecticut and the office in New York at considerable expense. The arrangement with the limousine service was that a car was hired at a flat rate of $5.50 an hour and there were several cars so that at all times a car would be available. In addition to the flat rate of $5.50 an hour for *268 the limousine service, there were certain additional charges. The additional charges were primarily for trips to the airports, for tolls, and for use of the mobile telephones installed in the limousines. The additional charges were $1,835.50 in 1959. The total amount spent by Tankoos & Company for the limousine service during 1959 was $7,660.59. Tankoos & Company spent as office cab fares the sum of $546.25 in 1959. During the same year, Tankoos & Company paid $6,397.06 to travel agencies, airlines, and railroads. Most of this amount was attributable to out-of-town traveling by Joseph to Florida, Canada, Venezuela, England, and France. The evidence of record did not disclose the relationship of these trips to the business activities of Tankoos & Company as distinguished from other business interests of Joseph. However, after Joseph's association with the Colony Hotel in Palm Beach, Florida, the expense of Joseph's trips to Palm Beach were charged to the hotel. Joseph's traveling within Canada was paid for by Tankoos-Yarmon, Limited. Joseph testified that the expenses in the travel and fares category, with the exception of at most 10 percent of the items claimed, were necessitated *269 by the business of Tankoos & Company and related to that business. Tankoos & Company deducted $3,959.64 for dues and subscriptions in 1959. Respondent disallowed only the following four items: Westchester Country Club
$ 605.00
Stamford Yacht Club
360.00
The 60 East Club
250.00
Country Club of Darien
382.50
$1,597.50
The dues relating to the Westchester Country Club were for the membership of Joseph. Joseph used the club facilities approximately 20 or 25 times during 1959, primarily in the summer months for golf. The restaurant facilities were sometimes used in conjunction with golfing. Various businessmen in the real estate field were entertained in this manner by Joseph. However, no record was kept of the people entertained or their connection with Tankoos & Company business. William used this club only occasionally. The dues relating to the Stamford Yacht Club were for William's membership. Moorage for William's boat, "Tankfull III," was obtained through this membership. The restaurant facilities of the club were occasionally used by William, solely in connection with the entertainment of customers, prospective customers, and business associates. *270 William and Joseph were members of the 60 East Club, which was a luncheon club for people in the real estate business. They used the club seldom. The dues relating to the Country Club of Darien were for the membership of William. Infrequent use was made of the dining facilities of the club for the purpose of entertaining customers, prospective customers, and other business associates. This club was started by various people from William's community and the primary reason for joining was the promotion of community good will; however, club facilities were used by William and his wife solely for business entertainment. William claimed as additional deductions on his return for 1959 filed jointly with his wife the following unreimbursed business expenses relating to Tankoos & Company: Business expenses as per daily expense
book
$3,809.50
Sales promotion expense
309.09
Travel, fares, auto expense
808.54
$4,927.13 Respondent disallowed $1,200 of the "Business Promotion & Travel Expense." It was contended by petitioners on brief that the disallowance only applied to the business expense deduction of $3,809.50. We find that the wording of the deficiency *271 notice was specific enough to apply to the total amount deducted under the three categories of business-related expenses, $4,927.13. A "daily expense" record book was placed in evidence. William's secretary testified that she made the entries in the record book daily based on notes given her by William. These expenses related to William's business activities and William was not reimbursed for them by Tankoos & Company. The total of the expenses entered in the record book for 1959 was $3,809.50. Of this amount, at least $117.50 was spent for cigars and $757.70 for taxis. An additional substantial sum was for tips. It is this total that was labeled "business expenses * * *" and deducted in William's income tax return. No evidence was presented with respect to the two other categories of expenses deducted on William's personal return, namely, the sales promotion expense and travel, fares, auto expense. Opinion Respondent contends that William's share in the income of Tankoos & Company should be increased due to the disallowance of certain business expenses claimed by the partnership in its 1959 income tax return. On that return, Tankoos & Company reported gross receipts of $123,694.44 *272 and total deductions of $116,781.53, leaving as ordinary income the sum of $6,912.91. Included in the claimed deductions of $116,781.53 were advertising and publicity expenses of $36,691.72, travel and fares expenses of $22,164.67, telephone and telegraph expenses of $9,263.13, and dues and subscription expenses of $3,959.64. The foregoing expenses amounted to $72,079.16, and the respondent disallowed $39,597.50 of these expenses as not being ordinary and necessary business expenses of Tankoos & Company. William claimed deductions on his joint return for certain unreimbursed business expenses related to Tankoos & Company in the amount of $4,927.13, substantially more than his entire share of partnership net income. Respondent disallowed $1,200 of this amount as not being ordinary and necessary business expenses. Joseph claimed a deduction of $2,150 for travel and entertainment in connection with employment in his 1959 return. The 1959 partnership return for Tankoos & Company stated that both Joseph and William devoted all of their time to partnership affairs. While this may have been true with respect to William, it certainly was not accurate as applied to Joseph that year. He *273 was active a considerable portion of the time in pursuit of his other real estate ventures, investments and interests in 1959. A preliminary issue involves petitioners' assertion at trial and on brief that respondent's issuance of the notice of deficiency was arbitrary and unreasonable. Petitioners' motions during the trial for a dismissal of the notice of deficiency or, in the alternative, for a ruling that the deficiency should not be afforded the normal presumption of correctness granted by Rule 32, Tax Court Rules of Practice, were denied. The right to renew this argument on brief, however, was granted. Petitioners contend that the notice of deficiency was issued hurriedly because of the nearness of the expiration of the statute of limitations and the lack of a duly appointed personal representative of the deceased taxpayer who could execute a waiver of the statute. Petitioners offered to prove that the books and records of Tankoos & Company had not been examined in detail by the revenue agent prior to the issuance of the notice of deficiency and that the supervisor of the revenue agent had, without any rational basis, instructed the agent to arrive at the deficiency by making *274 large blanket disallowances in round figures. Petitioners' offer of proof and motions were based upon a Supreme Court case holding that where the Commissioner's determination is arbitrary and unreasonable, the taxpayer may not be penalized for inability to prove the correct amount of the tax. Helvering v. Taylor, 293 U.S. 507 (1935). Petitioners urge that respondent bears the burden of proving here that the disallowed expenses were not deductible because his determination was arbitrary. We cannot agree. There was no evidence offered to show that the respondent's determination here was based upon the revenue agent's purported action in the partnership audit. On the contrary the evidence is otherwise. Also on brief petitioners conceded that the partnership books and records had been examined to some extent by the revenue agent before the deficiency determination before us was issued. We do not know exactly what books and records were kept or maintained by Tankoos & Company because no testimony about them was adduced at trial nor were they produced in court or offered into evidence. However, in order to explain the connection between claimed expense deductions and the *275 business of Tankoos & Company it was necessary to produce schedules, daybooks, diaries, itemized bills and receipts and the testimony of William's widow and the surviving partner. Notwithstanding, there were many gaps and the proximate relationship between expenditures and business remained obscure. It is apparent that the partnership records themselves were inadequate to establish the ordinary and necessary nature of the disputed deductions. Based upon our analysis of the entire record including petitioners' offered proof, we cannot discern how anything but blanket disallowances in round figures could have been made. Literally hundreds of items were involved to make up the totals claimed in various categories and the descriptive labels were misleading. The amount of business expenses claimed by Tankoos & Company in relation to its gross income would give rise to a rational belief that some of these expenses were not ordinary and necessary. A reasonably thorough analysis of the records which were introduced into evidence could not have dispelled this belief. It is not contended that more complete records were available for inspection, and, if they were, failure to submit them for *276 our examination is fatal to petitioners' position. Assuming as we must, therefore, that all available records were of the same nature as those submitted in evidence or discussed in testimony, we conclude that respondent was entirely justified in making general disallowances in round-figure amounts of part of the business expense deductions. We are unable to detect an element of arbitrariness or unreasonableness associated with blanket disallowance of substantial percentages of the amounts claimed under such circumstances. The partnership return showed on its face that the real estate brokerage business of Tankoos & Company was not newly established and that the two experienced partners devoted all of their time to the partnership affairs. After reporting gross income in excess of $123,000 and claiming specific deductions, other deductions of over $81,000 were claimed, of which total almost $75,000 was for "Advertising & publicity," "Traveling & fares," "Telephone and telegraph" and "Dues and subscriptions." Analysis of these categories readily discloses that hidden beneath those labels are very substantial entertainment expenses, the expenses of operating a yacht, renting chauffeur-driven *277 limousines, and memberships in a multitude of private clubs. After deduction of all claimed expenses each partner received less than $3,500 for an alleged year's full time effort. In John A. Guglielmetti, 35 T.C. 668 (1961) at 672 we observed: Where, as here, the claimed entertainment expenses strongly usggest personal indulgences of the taxpayer unrelated to his business, we need rather clear and detailed evidence before we will allow such expenditures to be considered "ordinary and necessary." Richard A. Sutter, 21 T.C. 170 (1953); Western Products Co., 28 T.C. 1196, 1217-1218 (1957); Eugene H. Walet, Jr., 31 T.C. 461, 471 (1958), affd. 272 F. 2d 694 (C.A. 5, 1959). See also Mitten Management, Inc., 29 B.T.A. 569, 577-578 (1939). * * * We feel that respondent likewise was entitled to clear and detailed evidence in the partnership's books and records to substantiate the business nature of the claimed deductions and that he did not act arbitrarily or unreasonably in making his disallowances in the short time that remained before limitations would bar a deficiency determination. Under all of the circumstances *278 disclosed here, there was certainly reason for respondent to suspect personal indulgences of the partners; the determination was reasonable, fair and entitled to the presumption of correctness we accord it. Section 162(a) of the Internal Revenue Code of 1954[4] allows a deduction for all ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. Business expenses deductible from gross income include the ordinary and necessary expenditures directly connected with or pertaining to the taxpayer's trade or business. Sec. 1.162-1(a), Income Tax Regs.
Section 262 provides that no deduction shall be allowed for personal, living or family expenses. Whether an expenditure is directly related to the taxpayer's business and whether it is ordinary and necessary are factual questions, the burden of proving them being on the taxpayer. Justice Cardozo once described the inquiry into whether an expense was an "ordinary and necessary" one of a business: "One struggles in vain for any *279 verbal formula that will supply a ready touchstone. The standard set up by the statute is not a rule of law; it is rather a way of life. Life in all its fullness must supply the answer to the riddle." Welch v. Helvering, 290 U.S. 111, 115 (1933). We will first consider the category of business expenses termed advertising and publicity by petitioner. As we have previously observed, most of the expenses in this category may be broadly classified as entertainment expenses and these included some of the expenses of operating a yacht, the cost of gifts, food, drink, lodging and tickets to theatrical performances. The deduction for entertainment expenses is peculiarly susceptible to abuse, and the courts have subjected it to special scrutiny by requiring that the one claiming it must show a proximate relationship between the entertainment and the business of the taxpayer. Challenge Manufacturing Co., 37 T.C. 650 (1962); Ralph E. Larrabee, 33 T.C. 838 (1960). We made the following statement pertaining to entertainment deductions in Eugene H. Walet, Jr., 31 T.C. 461, at 471 (1958), affd. 272 F. 2d 694 (C.A. 5, 1959): *280 * * * Certainly, the word "entertainment" is not a magic formula entitling one to deduction without inquiry as to whether the entertainment in question really had a significant bearing upon the conduct of the alleged business. The situation is one that is susceptible of gross abuse, and it is not too much to ask that one claiming such deductions show that the expenditures in question were genuinely related to the conduct of a business. In 1959 Tankoos & Company incurred total expenses of $6,467.23 in connection with the yacht, "Tankfull III," which was owned and operated by William. Petitioners introduced into evidence the log of "Tankfull III" in support of their contention that the yacht expenses were ordinary and necessary business expenses of Tankoos & Company. Petitioners also relied on the testimony of William's widow and Joseph. An analysis of the log, however, establishes that a substantial amount of the use of "Tankfull III" during 1959 was for William's personal pleasure. While it is clear that some of the guests entertained on "Tankfull III" were business acquaintances or associates, petitioners attempted to establish a business purpose for the entertainment through *281 assumption. The following statement in Challenge Manufacturing Co., supra, at 659-660, is particularly applicable: * * * It is entirely normal for friendships to develop with some of those that one meets in business transactions, * * * The mere fact that they may have been "business" contacts as well would not render deductible the cost of entertainment if it in fact was furnished primarily for social or personal reasons. * * * The entries in the log were not detailed enough to show a direct relationship between the presence of a business acquaintance on a specific occasion and the business of Tankoos & Company. In the light of all of the evidence of record, the self-serving opinion testimony of William's wife and Joseph that "Tankfull III" was used only for business entertaining is given little weight due to the inconsistencies between their testimony and the yacht's log. A contemporaneous record certainly has more probative value than the recollection of one witness who had never been on the yacht and another who was generally unfamiliar with the business affairs of her husband. Certainly the yacht was used a good part of the time for William's personal pleasure *282 and the enjoyment of his family. For the most part we conclude that the expenses for yachting were primarily related to William's pleasure and only incidentally related to the business of Tankoos & Company. They therefore cannot be deducted in full as ordinary and necessary business expenses of the partnership. Robert Lee Henry, 36 T.C. 879 (1961). While we agree that part of the expenses incurred in connection with the "Tankfull III" were properly deductible as business expenses of Tankoos & Company, the expenses related to the yacht were included with other advertising and publicity expenses totaling $36,691.72 of which $18,691.72 was allowed. We do not know the proportion or amount of yacht expenses disallowed and thus have no basis for adjusting respondent's disallowance. This is occasioned by the absence of a more detailed breakdown of business expenses claimed on the partnership return filed by Tankoos & Company. Petitioners have not presented evidence from which an exact finding or determination can be made and the respondent was not required to make specific disallowances under the circumstances. Petitioners must therefore suffer the consequences, if any there *283 be, because the evidence before us does not establish that the partnership was entitled to deduct more for yacht operating expenses than respondent's determination allows in this category. See United Aniline Company v. Commissioner, 316 F. 2d 701 (C.A. 1, 1963), affirming a Memorandum Opinion of this Court. Most of the other entertainment expenses claimed by Tankoos & Company in 1959 were $16,559.53 for hotels, restaurants and nightclubs, $7,290.59 for clubs and associations, $3,422.63 for liquor, $2,049.05 for theater tickets, $503.16 for flowers, $1,253.61 for camera supplies, and $289.10 for cigars. Petitioners have relied almost entirely on the testimony of Joseph to establish that the entertainment expenses in issue were ordinary and necessary business expenses of Tankoos & Company. The majority of the partnership's other entertainment expenses were incurred in connection with entertainment conducted by Joseph. Petitioners have not met their burden of proof with respect to the ordinary and necessary quality of these entertainment expenses. The record does not establish that the persons he entertained on particular occasions had a direct connection with the business *284 of Tankoos & Company, or that the entertainment was proximately related to that business rather than remotely or incidentally connected therewith. However desirable or helpful the program of constant and somewhat lavish entertaining may have been in Joseph's opinion it certainly was not ordinary (nor in our opinion appropriate) as a business practice for a small partnership, barely making ends meet, to wine, dine and chauffeur about town so many natives and visitors who at most had extremely remote and tenuous ties with the partnership business. Joseph's testimony attempted to disclose who had been entertained on specific occasions by references to Joseph's diary and receipts for entertainment expenditures. The diary usually contained dated entries of names of business acquaintances with no further information. Using these brief notations, Joseph endeavored to reconstruct what had happened by matching an item of expense with the entertainment of a person he had evidently seen on the same date. These were almost daily items when Joseph was in New York, and the list was long indeed but the testimony was vague and general. Joseph testified generally that expenses claimed related to *285 entertainment of his business acquaintances, and that those paid for by Tankoos & Company were for the benefit of Tankoos & Company. However, Joseph admitted that he had no recollection of any item of entertainment expense as to the person involved or the subject of any business discussions. Joseph's general testimony, therefore, was only supported by the assumption that he would not have charged an item of expense to Tankoos & Company unless the partnership was thereby benefited. We are particularly skeptical of Joseph's testimony due to his other business activities which were apparently quite profitable in comparison with Tankoos & Company's reported profit in 1959 of $6,912.91. Many of the people Joseph met and entertained while in New York City were connected with these and other business activities. We find it impossible to believe that no entertainment expenditures involving Joseph were properly attributable to these other highly profitable ventures. When the totality of the circumstances is viewed, petitioners' position that Joseph devoted all of his entertainment activities in New York to Tankoos & Company (from which he reportedly received only $3,456.46 during 1959) seems *286 untenable. Petitioners argue that it is inconceivable that William would have permitted Joseph to charge Tankoos & Company with unrelated entertainment expenses since William was almost entirely dependent on the earnings of the partnership. We find this argument unconvincing, particularly in view of our conclusion that William too was benefiting from the partnership's payment of many of his personal expenses for yachting, automobile and limousine use and entertaining. It may be that the real estate brokerage business is a freewheeling type of activity, and that it is doubtful that the tangible results of certain entertainment expenditures can be forecast at the time the expense is incurred. It is our observation, however, that Joseph benefited himself through many of the entertainment expenditures here in question. He certainly provided himself (and upon occasion young ladies who accompanied him) with good food and drink at some of New York's most popular wining and dining spots. Much of this should have been Joseph's personal expense. Richard A. Sutter, 21 T.C. 170 (1953). All of it not directly and proximately related to the business of Tankoos & Company cannot be *287 deducted by the partnership. We believe that many of Joseph's expenditures were for business reasons and generated important contacts for Joseph in the real estate field, thus promoting his extensive activities. The difficulty presented by the present controversy is due in some part to Joseph's interests in other business entities operating in the same field as Tankoos & Company, and in what amounted to Joseph's way of life in 1959. Thus, while we can agree that certain expenditures in question may have been business expenses of Joseph, we cannot agree that all such expenses should be attributed to one entity, Tankoos & Company, as opposed to Joseph personally or the group of entities in which he was interested. To be sure, many of Joseph's other real estate interests were not operating companies like Tankoos & Company and thus would not incur expenses of daily operations. It is our opinion, however, that many of the entertainment expenses incurred by Joseph promoted his personal good will, helped cultivate business related thereto. Many of the individuals entertained for the purported contacts for all of his real estate activities and were proximately benefit of Tankoos & Company *288 were involved in transactions with Joseph's other real estate ventures. It is impossible for us to believe that none of these other ventures were benefited directly by such expenditures while Tankoos & Company was picking up the tab. Joseph's testimony was inadequate to overcome the presumptive correctness of respondent's determination with respect to the advertising and publicity expenses. Joseph admitted that he had no recollection of any incidents in question, and the vague records of the past events only offered support for Joseph's conclusions if certain assumptions were made. The most important assumption throughout his entire testimony was that expenses would not be charged to Tankoos & Company unless they were validly related to the partnership's business. This assumption was most apparent when Joseph testified about items of expense incurred by William. For example, William charged large purchases of liquor to Tankoos & Company and Joseph testified that such expenditures were ordinary and necessary based upon his assumption that William would not charge the partnership unless the liquor was used for business purposes. However, there was no record of how the liquor was in *289 fact used, nor was other evidence presented to establish business purpose or connection. It is our observation that much of Joseph's testimony may be classified as mere conclusions of the witness since he had no personal knowledge or recollection of an event and no supporting documentary evidence tending to show the ordinary and necessary character of a particular expenditure. Joseph's testimony was basically his conclusion that the income tax return of Tankoos & Company was correct as filed due to his own habits and the habits of William. This general conclusion was accompanied by statements pertaining to specific expenditures to the effect that they must have been ordinary and necessary expenditures of Tankoos & Company. This type of testimony, without corroborating evidence of a persuasive nature, is incapable of overcoming respondent's presumption of correctness. See Louis Halle, 7 T.C. 245 (1946), affd. 175 F. 2d 500 (C.A. 2, 1949), certiorari denied 338 U.S. 949 (1950). Therefore, it is our judgment and we must conclude that $18,000 of the advertising and publicity expenses claimed by Tankoos & Company were properly disallowed. Respondent's *290 disallowance of this amount has not been shown to be wrong. The next category of business expenses in question is telephone and telegraph expenses. Respondent disallowed $3,000 of the $9,263.13 claimed as such expenses by Tankoos & Company in 1959. No records were kept which would have shown the connection between these expenses and the business of Tankoos & Company, Petitioners introduced into evidence the telephone and telegraph bills, but this evidence only established the amount spent by Tankoos & Company and the places to which calls were made and telegrams sent. Joseph could not recall the person with whom he talked or the subject of conversation in connection with any of the calls. It was established, however, that $4,857.56 of the total amount spent represented charges for toll calls out of town. Since Joseph handled most of the out-of-town business, it can be assumed that Joseph made most of these calls. Much of the preceding discussion of entertainment expenses is equally applicable to the telephone and telegraph expenses. It seems most probable that the subject of many out-of-town calls as well as in-town- calls was Joseph's other real estate activities. Calls were made *291 to places which would lead one to conclude that transactions were discussed in which Tankoos & Company was not involved. The inability of petitioners to produce any evidence other than Joseph's generalized and vague self-serving conclusions is fatal to their attempt to overcome respondent's presumption of correctness. Therefore, we sustain the respondent's disallowance and hold that $3,000 of the telephone and telegraph expenses claimed by Tankoos & Company were properly disallowed. The next item of expense in issue is the $22,164.67 claimed by Tankoos & Company for traveling and fares. Respondent disallowed $17,000 of the amount claimed. Petitioners once again relied on Joseph's testimony to establish the ordinary and necessary quality of these expenditures for the business of Tankoos & Company. It is our opinion, however, that petitioners have sustained their burden of proof at least as to a portion of the disallowed expenses in this category. We are convinced that Tankoos & Company was engaged in a type of business which required traveling by its partners within the New York area and to a lesser extent in Canada and Florida. This would account for relatively large expenditures *292 for the use of rental automobiles and cabs. Some of the out-of-town trips were seemingly unproductive of income but no doubt constituted attempts to obtain new business for Tankoos & Company. However, while we agree with petitioners that Tankoos & Company made ordinary and necessary expenditures for traveling and fares in an amount greater than the $5,164.67 allowed by respondent, we find the evidence insufficient to prove that the entire $22,164.67 was properly deducted. The amount expended for limousine service seems excessive because of the large amount spent for other rental cars and cabs and also because the limousine was used frequently and extensively for personal purposes and in connection with entertainment which we have found was not ordinary or necessary for the Tankoos & Company business operation. We also question the $1,800 credit to William for the use of his personal car and expenses paid for its operation and maintenance. The evidence indicates that he used it to commute back and forth from Connecticut where he lived to New York; in town he used taxis daily for business trips. The expense records and the testimony of record are not complete enough to establish a *293 direct connection between these expenses and the business of Tankoos & Company. Joseph's testimony in this area is subject to the criticisms previously discussed. Similarly, the relevance of much of the out-of-town travel to Tankoos & Company business was not adequately explained nor was the detail supplied which should have been forthcoming to show the business nature of many of the trips. Taking all of the foregoing factors into consideration and making the best approximation we can from a record made complex by a multitude of transactions and minutiae which seem to be a necessary though tedious element of this type of case, we conclude that Tankoos & Company made ordinary and necessary expenditures of $14,000 for traveling and fares in 1959. See Cohan v. Commissioner, 39 F. 2d 540 (C.A. 2, 1930). The final item of expense claimed by Tankoos & Company and of concern in this case involves $3,959.64 for dues and subscriptions. Respondent disallowed only the following four expenditures: Westchester Country Club
$ 605.00
Stamford Yacht Club
360.00
The 60 East Club
250.00
Country Club of Darien
382.50
$1,597.50 From the evidence presented, *294 we find that at least a part of the payments of dues to the Stamford Yacht Club and dues for the Darien Country Club were ordinary and necessary business expenses of Tankoos & Company. As we have previously noted there was sufficient evidence tending to prove that a certain amount of qualifying business entertainment occurred aboard William's yacht, the "Tankfull III." Membership in the Stamford Yacht Club provided moorage for the yacht and restaurant facilities which were used by William upon occasion solely for business entertaining. However, since we have found that the "Tankfull III" was also often used for pleasure, a part of the expenditure for this club should not have been deducted. Using our best judgment of what a fair apportionment would be, we apply the rule of the Cohan case, supra, and hold that $150 of the amount paid to this club was attributable to business purposes and properly deducted by Tankoos & Company. The testimony of Elizabeth B. Tankoos, William's widow, was frank and convincing that the Country Club of Darien was used solely for business entertaining; that because of her husband's health they did little personal entertaining in 1959 and that when they *295 did it was at home. Since the facilities of this club were used solely for business purposes, the dues there should have been allowed as a deduction. With respect to the other club expenditures in controversy, there was little helpful testimony and no records were introduced into evidence showing the persons entertained at thsse clubs. Joseph's testimony was vague and general about the two clubs which he utilized, the Westchester Country Club and the 60 East Club. These memberships probably benefited his other real estate interests and no direct or proximate connection or specific benefit was shown to have inured to Tankoos & Company by these expenditures. Since the evidence does not disclose that the partnership business received any direct benefit from the memberships in these clubs, we hold that petitioners have not sustained their burden of proof with respect to these club expenditures. Respondent's determination with respect thereto is deemed correct and must stand. See A. T. Miller, 39 T.C. 940 (1963), affd. 333 F. 2d 400 (C.A. 8, 1964). Respondent also disallowed $1,200 out of a total amount of $4,927.13 deducted by William on his personal return *296 for the following miscellaneous business expenses for which he was not reimbursed by Tankoos & Company: Business expenses as per daily
expense book
$3,809.50
Sales promotion expense
309.09
Travel, Fares, Auto expense
808.54 The first item, business expenses, was made up of various miscellaneous expenses paid by William in 1959 from his own funds, allegedly connected with the partnership business. Some of them were undoubtedly business expenses, but others were, to say the least, questionable. Most of the items were for taxis, tips, cigars and lunch in New York. Certainly a substantial portion was for William's own personal daily noontime activities. Petitioners relied upon a "daily expense" record book which they introduced into evidence to carry their burden of proof with respect to the first item. William's death made the explanation of some of the entries in this book impossible. Nevertheless, it is contended that they all related to the business of Tankoos & Company and were ordinary and necessary expenses. The amounts claimed for certain items seem particularly excessive, such as $117.50 for cigars, $757.70 for taxis and daily tips of from $3 up. *297 The mere entry of expenditures in this book does not convince us that they were all ordinary and necessary business expenses. Certainly the evidence presented is inadequate to establish the deductibility of more than has been allowed. Moreover, petitioners introduced no evidence pertaining to the two other items of expense deducted by William, namely, the sales promotion expense and the travel, fares, auto expense. Thus, we have no conception of the actual nature of these expenses. No explanation was offered as to why William was not reimbursed for these expenses which were allegedly incurred for the benefit of Tankoos & Company. William was reimbursed for many other expenditures of a similar type. Under such circumstances, it has been held that the unreimbursed expenses are prima facie personal and therefore not deductibel. Heidt v. Commissioner, 274 F. 2d 25 (C.A. 7, 1959), affirming a Memorandum Opinion of this Court; Noland v. Commissioner, 269 F. 2d 108 (C.A. 4, 1959), affirming a Memorandum Opinion of this Court, certiorari denied 361 U.S. 885 (1959); William C. Stolk, 40 T.C. 345 (1963) acq. 1964-2 C.B. 7, *298 affirmed per curiam 326 F.2d 760 (C.A. 2, 1964). Petitioners have not presented enough evidence to warrant a change in respondent's determination that $1,200 of the preceding expenses should not have been deducted by William. We therefore uphold the correctness of respondent's disallowance. Due to our finding that Tankoos & Company could have properly deducted $14,000 for traveling and fares expenses and $2,894.64 for dues and subscriptions, the amount by which respondent increased William's share of partnership income should be reduced accordingly. Decision will be entered under Rule 50. Footnotes
1. The reason for not increasing William's share of partnership income by exactly one-half of the amount disallowed is not explained.↩
2. For example, the financial reports for Bisley, Limited, and Onslow Investments, Limited, covered only the last seven months of 1959 and thus failed to clearly reflect profitable transactions occurring earlier in 1959.↩
3. How this so-called credit worked is not precisely clear from the record but apparently William was paid by Tankoos & Company at the rate fo $150 per month for the use of his car.↩
4. All statutory references hereinafter are to the Internal Revenue Code of 1954 unless otherwise indicated.↩