JOHN A. GUGLIELMETTI AND PAULINE M. GUGLIELMETTI, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 76118.  Filed January 30, 1961.

*Charles W. Tuckman, Esq.*, for the petitioners.
*Joseph D. Holmes, Jr., Esq.*, and *Aaron S. Resnik, Esq.*, for the respondent.

FORRESTER, *Judge:* Respondent has determined deficiencies in income tax in the amounts of $2,092.94 and $1,653.85 for the years 1954 and 1955, respectively, and an addition to tax for underpayment of estimated tax in the amount of $247.41 for the year 1955.

The issues now remaining for our determination are (1) whether respondent erred in disallowing a portion of the expenses claimed by petitioner for "Travel and Entertainment" and "Outside Business Promotion & Subscriptions" in the year 1955; (2) whether premiums paid for a policy on the life of the husband were ordinary and necessary business expenses; (3) whether initiation fees and dues for membership in a country club were ordinary and necessary business expenses; and (4) whether the respondent erred in his determination of the "period of underpayment" for the purpose of computing the addition to tax for underpayment of estimated taxes in the year 1955.

### FINDINGS OF FACT.

Some of the facts have been stipulated and are so found.

Petitioners, husband and wife, reside in San Jose, California.  They filed their joint Federal income tax returns for 1954 and 1955 on the calendar year basis with the district director of internal revenue at San Francisco, California.  The husband (sometimes hereinafter referred to as the petitioner) during the years involved was engaged as sole proprietor in the car-washing business in San Jose.

In 1955, the wife and petitioners' three daughters, then aged 11, 13, and 15, went to Toledo, Ohio, to visit friends and relatives.  Petitioner flew to Toledo to join them 3 weeks later, spending $99.77 (including tax) on his airline ticket.  From Toledo the five took a train to Detroit, Michigan.  Petitioner, at the time, was serving as western sales representative for "Minit-Man" (manufacturers of car-washing equipment), although he received no 1955 income for this

work. While in the Detroit area, petitioner went to the Minit-Man factory in nearby Royal Oak, Michigan, and also discussed car-washing equipment with another automobile laundry in Detroit.

In Detroit, petitioner purchased a car and then proceeded to travel to Toronto, Canada, where he observed a car-washing plant. From there the family went eastward to Montreal, thence to Albany and New York City, and finally to Washington, D.C., visiting several car-washing establishments along this route. The family went to some of these plants with petitioner but they all did considerable sight-seeing. En route home from Washington, D.C., the Guglielmettis stopped at only one car-washing plant, in Salt Lake City, Utah. The trip from Detroit east and back to San Jose covered 5,500 miles and lasted 15 days.

On this trip, petitioner had taken $800 in traveler's checks and his wife and children took about $900 more in cash. Almost all of this money was spent on the trip. Petitioner acquired some useful information about car-washing equipment and operations on the trip.

In 1955, the wife spent some time in the business, mainly as cashier, and the two older girls put in nominal amounts of time as cashiers.

In 1955, petitioner made a trip to Los Angeles and several trips to Sacramento and the San Francisco-Oakland area in California to inspect Minit-Man operations.

Petitioners belonged to the La Rinconada Golf Club but used it largely for personal purposes and did little business entertaining there. Petitioners paid $90 in 1954 and $360 in 1955 as initiation fees for their membership in the club. In 1955, petitioners also paid $72 as regular monthly dues. The $90 fee for 1954 was deducted by petitioners on their business income schedule under "Dues & Subscription."

Petitioner also picked up checks at local restaurants and bars for various people. Sometimes, on an impromptu basis, he would so entertain an owner of one of the eight fleets of cars whose accounts he regularly serviced.

Petitioner's books and records for 1955 reflect an expenditure of $2,499.52 for "Travel and Entertainment." This is the amount deducted in the business income schedule on petitioners' 1955 Federal income tax return for travel and entertainment. This amount was recorded under a system wherein petitioner would spend these sums from petty cash and insert notations explaining such expenditures into a folder; at the end of each month the bookkeeper would reimburse the petty cash account for the total drawn therefrom. The ledger account would then reflect as traveling expenses the total of each monthly reimbursement.

The $2,499.52 in the account included, as expenses of the eastern trip, the $800 spent for traveler's checks and the $99.77 for the airline

ticket. Of these amounts, respondent allowed $450 for the trip. Said $2,499.52 also included the $432 (as entertainment expenses) expended for club initiation and dues in 1955, which amount was entirely disallowed by respondent.

Of the remaining $1,167.75 ($2,499.52 less the sum of $800, $99.77, and $432) in the account, respondent allowed $729.71 for 1955 travel and miscellaneous expenses but none for entertainment. Included in said $729.71 was $340 for trips to Oakland and Sacramento and $96 for the trip to Los Angeles.

On the itemized deduction schedule for 1955, petitioners deducted another $938 for "Outside Business Promotion & Subscriptions"[1] which was disallowed by respondent. Included in this amount were some of the costs of picking up the checks at the various restaurants and bars, and entertaining people at the club, but a substantial portion of it was expended for various school and purely social functions given by the wife at the Guglielmetti home.

A reasonable allowance for 1955 traveling expenses on petitioners' eastern trip was $450; for miscellaneous expenses in 1955 (including travel in California) $729.71; and for 1955 business entertainment $200.

### Life Insurance.

On March 1, 1951, petitioner purchased a 5-year term insurance policy on his own life with his wife as beneficiary. Petitioner had the full ownership rights in the policy, including the right to change beneficiary. The quarterly premium was $81. On May 10, 1951, petitioner borrowed $7,500 principal sum from the Bank of America for use in his business. The loan was repayable in installments, the last payment being made on May 1, 1955. On July 1, 1955, the last premium was paid on the policy which then lapsed on October 1, 1955. The loan agreement did not require the purchase of the insurance policy, nor was it listed on petitioner's application for said loan. The premiums paid on this policy, $324 in 1954 and $243 in 1955, were deducted on the business income schedules of petitioners' returns for the respective years and were completely disallowed by respondent.

### Estimated Tax.

For the year 1954, petitioners reported a Federal income tax liability of $1,817.66. For the year 1955 petitioners filed no declara-

---

[1] Concededly, there were no items of subscriptions included herein. Petitioners make no attempt to explain why this sum was not deducted on the business section of the return along with the $2,499.52 other than to state that these were informal out-of-pocket expenditures which were erroneously treated separately from the amounts entered on the books. We consider this deduction as though it had been taken in the business income section of the return (Schedule C) and understand the $938 to be claimed for business entertainment expenditure.

tion of estimated tax until they estimated their 1955 tax to be $2,460 and paid $1,845 on account on September 15, 1955. The balance owing on this declaration ($615) was paid on January 25, 1956.

The Federal tax liability reported on the 1955 return was $11,497.92.

## OPINION.

We are called upon to decide the amount of traveling and entertainment expenses properly deductible by petitioners under section 162 of the 1954 Code.[2] We must likewise determine whether the premiums paid on the policy on petitioner's life are deductible under that section.

### Traveling.

It is clear under the statute that the traveling expenses must be in pursuit of trade or business. There is thus presented here the rather routine question, purely factual in nature, of whether the claimed traveling expenses were incurred in such pursuit. On such a question, it is axiomatic that the petitioner bears the burden of proof and must also demonstrate the amounts so spent.

Turning first to the petitioners' eastern trip, petitioner's testimony supports the conclusion that the purposes of such trip were combined business and pleasure. Thus, undoubtedly a portion of the petitioner's own expenses in visiting the various car-washing plants was deductible. However, the connection of the wife with the operation of the business appears to have been rather casual and, by petitioner's own testimony, her function was largely clerical. Thus, we do not feel that petitioners have carried their burden of establishing that the wife's presence on the trip served a bona fide business purpose.[3] Her expenses are hence nondeductible.

Absent proof much more forceful in character than that here presented, we cannot find that girls in their preteens and early teens made a cross-country journey for the purpose of making technical observations of the functioning of automobile-washing equipment. It is abundantly clear to us that petitioners' three daughters derived personal pleasure rather than business and technical experience from their trip.

All that petitioner has proven is that part of his own expenses was in pursuit of his trade or business. Although petitioner purported

---

[2] All Code references are to the Internal Revenue Code of 1954.

[3] Section 162–2(c), Income Tax Regs., provides as follows:

(c) Where a taxpayer's wife accompanies him on a business trip, expenses attributable to her travel are not deductible unless it can be adequately shown that the wife's presence on the trip has a bona fide business purpose. The wife's performance of some incidental service does not cause her expenses to qualify as deductible business expenses. The same rules apply to any other members of the taxpayer's family who accompany him on such a trip.

to have many receipts and canceled checks, he introduced no supporting documents or other evidence from which we can determine the precise amount attributable to this aspect of the trip. Petitioner's testimony as to his own expenses is rather vague and does not afford any clue as to amounts or items so expended. Certainly, the mere book entries totaling $800 for the traveler's checks and $99.77 for the airline ticket do not prove the business nature of these amounts. *Doyle v. Mitchell Brothers Co.*, 247 U.S. 179 (1918).

Considering that even the petitioner himself had mixed purposes in taking the trip, we feel that respondent's allowance of $450 (including the airline ticket) for the business aspect of the trip was adequate, and we so hold.

As to the local trips in California and the miscellaneous traveling expenses, again petitioner introduced no evidence other than the book entries. While we believe that petitioner took some business-motivated trips in this area, we see no basis for concluding that respondent's allowance of $729.71 for these items was arbitrarily low or unreasonable, and his determination is sustained. If there be support for larger business expenditures, petitioners have failed to produce it.

### *Entertainment, Club Fees, and Dues.*

There is no specific deduction in section 162 for entertainment expenses but rather such expenses must meet the test of being "ordinary and necessary" expenses in the carrying on of the trade or business. To be so deductible, the expenditure must have some definite, reasonable, and necessary purpose connected with the taxpayer's business and must also be reasonably calculated to accomplish the end sought.

Where, as here, the claimed entertainment expenses strongly suggest personal indulgences of the taxpayer unrelated to his business, we need rather clear and detailed evidence before we will allow such expenditures to be considered "ordinary and necessary." *Richard A. Sutter*, 21 T.C. 170 (1953); *Western Products Co.*, 28 T.C. 1196, 1217–1218 (1957); *Eugene H. Walet, Jr.*, 31 T.C. 461, 471 (1958), affd. 272 F. 2d 694 (C.A. 5, 1959). See also *Mitten Management, Inc.*, 29 B.T.A. 569, 577–578 (1933). Thus, we cannot here accept (without any proof and contrary to petitioner's own testimony that many of these items were spent by his wife for school and social functions at their home) that the full $938 claimed for 1955 by petitioners was entertainment expense.

It is even clearer to us, and, indeed, we have so ruled from the bench at the trial of this proceeding, that the $90 in 1954 and the $432 in 1955 for club dues and initiation fees were spent for the personal pleasure of the taxpayers. See especially *Western Products Co., supra.* We are

convinced that the business purpose of such membership was very remote and petitioner has done nothing to persuade us to the contrary.

We also bear in mind that much of the casual restaurant. and bar entertaining was not shown to be of petitioner's customers, actual or potential. However, we do believe that some indefinite amount of this impromptu entertaining was of officers of the various fleet accounts upon whose continued patronage petitioner was dependent for part of his income (no precise amount of "fleet" business, absolutely or relatively, is disclosed by the record). In such case, we have exercised our own best judgment, bearing heavily against the taxpayer as the inexactitude was of his own making, and have found that $200 was so spent in 1955 and is deductible under section 162. *Cohan* v. *Commissioner*, 39 F. 2d 540 (C.A. 2, 1930).

## Insurance Premiums.

There is not a shred of evidence to support petitioners' position that the insurance policy was required in order to obtain the loan, or even helpful in that regard. The financial statement portion of the application for this loan did not disclose its existence nor does the record reveal any other business use of this policy. To the contrary, it is undisputed that petitioner had full control of all rights under the policy of which his wife was beneficiary, and we observe further that the possibilities for a business use of this policy were limited, since it was a term policy, generating little or no cash surrender value.

It became so clear at the trial of this case that this insurance policy was purely personal and squarely within section 262, I.R.C., that it was so ruled from the bench, and we now observe that it is beyond our comprehension that a practicing attorney could have seriously urged such a proposition as this before any court.

## Estimated Tax.

Respondent asserted an addition to tax under section 6654 of the 1954 Code [4] for underpayment of 1955 estimated tax. In computing

---

[4] SEC. 6654. FAILURE BY INDIVIDUAL TO PAY ESTIMATED INCOME TAX.

(a) ADDITION TO THE TAX.—In the case of any underpayment of estimated tax by an individual, except as provided in subsection (d), there shall be added to the tax under chapter 1 for the taxable year an amount determined at the rate of 6 percent per annum upon the amount of the underpayment (determined under subsection (b)) for the period of the underpayment (determined under subsection (c)).

(b) AMOUNT OF UNDERPAYMENT.—For purposes of subsection (a), the amount of the underpayment shall be the excess of—

(1) The amount of the installment which would be required to be paid if the estimated tax were equal to 70 percent * * * of the tax shown on the return for the taxable year * * * over

(2) The amount, if any, of the installment paid on or before the last date prescribed for such payment.

(c) PERIOD OF UNDERPAYMENT.—The period of the underpayment shall run from the

this addition to tax respondent now concedes that, inasmuch as the third quarter payment of $1,845 exceeds the tax liability shown on the 1954 return, section 6654(d)(1)(A) prevents the imposition of this addition for the third and fourth quarters of 1955.

However, for the first two quarters of 1955 respondent has determined the amounts of underpayment under section 6654(b), by taking 70 percent of the 1955 tax liability and dividing it into quarters. This amounts to $2,012.14 per quarter. There being no timely payments, respondent multiplied this last amount by 6 percent for the period of underpayment which respondent determined to be 1 year in the case of the first quarter installment and 10 months in the case of the second.

Petitioners do not appear to challenge the determination of the *amount* of underpayment under section 6654(b), but argue that in determining the *period* of underpayment under 6654(c) respondent should have ended the period on September 15 when the third quarter payment of $1,845 was made. True, section 6654(c) provides that the period ends when the earlier underpayment is paid. However, the second sentence of subsection (c)(2), noticeably the portion we have italicized, provides that the current payment is considered to pay the previous underpayment only after the current payment first pays the amount due for the current quarter under subsection (b)(1). It is not sufficient, as petitioners urge, that the current payment exceeds what would be due based on the prior year's tax. This subsection (b)(1) amount would be $2,012.14 as determined above. Since less than this amount was paid there is, under subsection (c)(2), no amount considered to have been paid against the underpayment of the first two quarters. Accordingly, under section 6654(c) the period of the underpayment for the full amounts underpaid for the first two quarters did not expire until April 15, 1956. Accordingly, we approve

date the installment was required to be paid to whichever of the following dates is the earlier—

(1) The 15th day of the fourth month following the close of the taxable year.

(2) With respect to any portion of the underpayment, the date on which such portion is paid. For purposes of this paragraph, a payment of estimated tax on any installment date shall be considered a payment of any previous underpayment *only to the extent such payment exceeds the amount of the installment determined under subsection (b)(1) for such installment date.*

(d) EXCEPTION.—Notwithstanding the provisions of the preceding subsections, the addition to the tax with respect to any underpayment of any installment shall not be imposed if the total amount of all payments of estimated tax made *on or before the last date prescribed for the payment of such installment* equals or exceeds whichever of the following is the lesser—

(1) The amount which would have been required to be paid on or before such date if the estimated tax were whichever of the following is the least—

(A) The tax shown on the return of the individual for the preceding taxable year, if a return showing a liability for tax was filed by the individual for the preceding taxable year and such preceding year was a taxable year of 12 months, * * *

[Emphasis supplied.]

respondent's computation of the addition to tax for underpayment of estimated tax.

A further question is whether the third quarter payment, by coming within the exception of subsection (d), operates to stop the running of the 6 percent addition to tax for the first two underpayments after that date. On this point, we note that the italicized portion of subsection (d) makes the (d) exception applicable only to installments for which the payment (based on the prior year's tax liability) is made by the date prescribed for it. Thus, as we read section 6654 in its entirety, the applicability of subsection (a) to any particular underpayment is determined as of the date the particular installment was due. Subsequent compliance with the excepting language of subsection (d) cannot operate to alter the operation of the provisions of (a) if they were applicable at the time the installment was due. Subsequent payments can stop the continued accrual of the 6 percent addition on an earlier underpayment only to the extent which, under (c) (2), such payment is entitled to be considered a payment on account of the earlier underpayment. As we have decided above that the third quarter payment could not be so considered to any extent, it follows that the 6 percent runs on the total underpayments until April 15, 1956, as provided in (c) (1),

To effectuate our opinion herein and the concessions of the parties—

*Decision will be entered under Rule 50.*