STEPHEN L. SMITH, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
SMITH v. COMMISSIONER
Docket Nos. 30189-89, 17897-92.[1]
United States Tax Court
T.C. Memo 1995-402; 1995 Tax Ct. Memo LEXIS 402; 70 T.C.M. (CCH) 463; August 21, 1995, Filed *402 Decision will be entered under Rule 155. Vaughn C. Brennan, for petitioner. Charles A. Baer, for respondent. GERBER, Judge GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION GERBER, Judge: Respondent determined deficiencies in and additions to petitioner's Federal income tax as follows: Docket No. 30189-89
Additions to Tax
Sec.
Sec.
Sec.
6653
6653
Sec.
6653
(a)
Sec.
(b)
6651
(a) (1)
(1)
6653
(1)
Sec.
Year
Deficiency
(a)(1)
(A)
(B)
(b)(1)(A)
(B)
6661
1986
$ 3,775,434
--  --  --
$ 2,752,907
[1]
$ 943,859
1987
770,277
$ 188,719
$ 38,514
[2]
--  --
192,569
Docket No. 17897-92 Additions to Tax
Sec.
Sec. Sec.
Year
Deficiency
6653(b)(1)
6653(b)(2)
6661
1985
$ 1,499,513
$ 749,757
[1]
$ 374,878
All section references are to the Internal Revenue Code in effect for the years in issue. Rule references are to the Tax Court Rules of Practice and Procedure. After concessions, the issues remaining for our consideration *403 are: (1) Whether petitioner is estopped from denying the facts found in various criminal and civil proceedings by the U.S. District Court and Florida State court; (2) whether petitioner failed to report income from S.H. Oil and Gas Exploration (S.H. Oil) in 1986 and 1987; (3) whether petitioner failed to report income from his Barnett Bank loan in 1985; (4) whether life insurance premiums incurred by petitioner in 1985 and 1986 are deductible; (5) whether alleged consulting expenses are deductible; (6) whether petitioner is liable for the addition to tax for fraud for 1985 and 1986; (7) whether petitioner is liable for the addition to tax for negligence or intentional disregard of rules or regulations for 1987; and (8) whether petitioner is liable for the addition to tax for substantial understatement of income tax for 1985, 1986, and 1987. FINDINGS OF FACT [2]
Petitioner was incarcerated in the State of Florida when both petitions *404 were filed in this case. Petitioner holds bachelor's and master's degrees in business administration. In 1977, petitioner formed a sole proprietorship known as S.H. Oil, purporting to engage in exploration for oil and gas. Petitioner solicited investments in S.H. Oil and told prospective investors that they would be investing in oil and gas leases or projects. To induce investment in S.H. Oil, petitioner told these individuals that he was experienced in the oil and gas industry when, in fact, he had no such experience. Petitioner kept in his office several charts and graphs which purported to document and provide visual support for his investment scheme. Petitioner sent some clients phony promotional materials entitled "Background of S.H. Oil and Gas Exploration" and "Narrative of S.H. Oil", which purported to provide background information about the financial scheme. For example, one pamphlet falsely stated that Mr. Smith has drilled, developed, and supervised the drilling of 266 oil or gas wells since 1973, and that, of the 266 oil or gas wells, 249 were in commercial production. S.H. Oil offered potential investors two different investment devices, both purporting to involve *405 the production of oil and gas. The "partial assignments of leases" purported to assign an undivided net revenue interest in a project consisting of one or more oil and gas leases in a certain county and State. A "production pool" account was to provide investors with a guaranteed interest return on the balance of their invested funds. As of December 31, 1987, there were nearly 485 investors in the various projects, having invested a total of approximately $ 93,611,100. S.H. Oil did not begin as a fraudulent scheme; however, from late 1981 through December 1987, petitioner sold partial assignments of leases, most of which he did not actually own, and he sold interests that he knew did not exist. To raise capital, petitioner sold more than 100 percent of some well programs. From 1977 through 1987, he received over $ 125 million from investors through his S.H. Oil scheme; however, he expended only 1 percent of this total for oil and gas related activity. S.H. Oil became a Ponzi scheme. Specifically, Mr. Smith took money from new customers and used the funds to pay off the existing investors. Roger Handley, a financial investigator for the State of Florida, traced the flow of funds to *406 and from S.H. Oil. Mr. Handley found that income was generated from certain wells; however, the amount was minuscule in relation to the amounts being paid to the investors. From 1977 through 1987, Mr. Smith spent substantially more for his own personal consumption and acquisitions than he "invested" in the purported oil and gas activities. For instance, during those years, Mr. Smith spent $ 789,054 on department store purchases, $ 1,859,778 on credit card purchases, $ 711,975 on jewelry, $ 2,347,818 on real estate, and $ 471,846 on vehicles, while spending only $ 1,778,698 on oil and gas venture related expenditures. In March 1985, petitioner sought a loan from Barnett Bank. To support his application, petitioner submitted a financial statement dated February 1, 1985. Based on information provided by petitioner, the accounting firm of Coopers & Lybrand prepared a compilation report to support petitioner's credit application with Barnett Bank. The entries on petitioner's financial statement showed that he owned $ 29 million in oil reserves and $ 36.7 million in gas reserves. Furthermore, the document reflected that petitioner's net worth was $ 74.3 million. These numbers were false. *407 Through these documents, and with a March 17, 1982, letter that he falsified, petitioner convinced Barnett Bank that he owned 17 oil and gas leases. Petitioner was granted a credit line. Ultimately, petitioner represented to Barnett Bank that he sought renewal of the line of credit for business purposes, and that he needed the working capital. Although these were affirmative misrepresentations, Barnett Bank reaffirmed petitioner's $ 2 million line of credit. Petitioner often drew from this line of credit for his personal use. On March 25, 1985, petitioner submitted false and fraudulent financial statements, containing overstatements of his oil and gas assets, to Barnett Bank in order to obtain another $ 1 million line of credit. Barnett Bank granted petitioner the credit line, and, on March 28, 1985, petitioner withdrew $ 300. On April 29, 1985, petitioner disbursed the remaining $ 999,700 to himself, and deposited the money into his personal money market account. Despite petitioner's large loan balance, he had few personal sources from which to repay Barnett Bank. In May 1986, petitioner received a letter from John Curry, purportedly a financial consultant, encouraging petitioner *408 to pay "consulting" fees to Mr. Curry personally, or to his entity, the Consulting Group, Inc. Mr. Curry promised petitioner that the payments could be deducted as consulting fees, with the potential for tax-free repayment. Mr. Curry advised petitioner to take an immediate deduction for funds paid to Mr. Curry; then, in Bermuda, Mr. Curry would return the funds to petitioner tax free, plus 50-percent interest per year, by September 30, 1987. Petitioner claimed deductions of $ 32,500 in 1985, $ 147,500 in 1986, and $ 553,500 in 1987 with respect to payments made to Mr. Curry or to the Consulting Group, Inc. Petitioner's 1985 and 1986 Federal income tax returns were prepared by Coopers & Lybrand based on information supplied by petitioner. On Schedule B of those returns, petitioner specifically denied ownership or an interest in a bank account in a foreign country. In 1987, petitioner did not file a Schedule B with his Federal tax return, thus failing to answer the foreign accounts questions altogether. Despite these circumstances, petitioner did maintain a bank account with Butterfield Bank in Bermuda from 1985 through 1987. In September 1987, the Florida State comptroller's office *409 received an anonymous letter regarding Mr. Smith's S.H. Oil activities. On October 20, 1987, Roger Handley, an agent from the Florida State comptroller's office, met with petitioner and his attorney. During this meeting, petitioner explained that S.H. Oil was in the business of selling interests in oil and gas leases, and that the investors would profit from the income generated. Mr. Handley felt, however, that there was not enough income being produced to make the scheme legitimate. Through his investigation, Mr. Handley discovered that, although petitioner was making payments to certain investors as if he owned 100 percent of the production rights, petitioner actually owned approximately 1.37 percent of the rights. After further inquiry, Mr. Handley asked petitioner's attorney for more proof in order to substantiate petitioner's income. Mr. Handley was presented with copies of checks totaling millions of dollars, purporting to be written by AMOCO. With a photocopier, correction fluid, and a typewriter, Mr. Smith turned a $ 3,605 check (payable to another individual) into three separate checks from AMOCO totaling $ 11.5 million. Petitioner presented these falsified copies of checks *410 to Mr. Handley in an attempt to prove a business relationship with AMOCO; he represented that these funds were actually income realized from oil sales to AMOCO. On December 30, 1987, the comptroller's office of the State of Florida obtained an injunction to cause S.H. Oil to cease operations, and to appoint a receiver to take possession of all of the assets of S.H. Oil, as well as all assets belonging to petitioner, his then wife, Heather M. Smith, and their child, Ross Smith. The receiver engaged the accounting firm of Deloitte, Haskins & Sells (Deloitte) to evaluate petitioner's cash receipts and disbursements. The accountants discovered that, in 1986, S.H. Oil had gross receipts from its lease and pool arrangements of $ 35,049,257, and the funds returned to investors totaled $ 26,540,132. On his 1986 Federal income tax return, petitioner reported gross receipts of $ 28,750,004 and funds returned to investors of $ 25,305,960. For 1987, Deloitte calculated petitioner's gross receipts to be $ 58,137,812 and his total funds returned to investors to be $ 55,408,323. Petitioner did not file a 1987 Federal income tax return until October 1990, after respondent sent the notice of deficiency *411 for 1987. In his 1987 return, petitioner reported $ 65,606,397 of gross receipts and cost of sales of $ 69,103,056. On February 24, 1989, petitioner filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code in the U.S. Bankruptcy Court for the Middle District of Florida (bankruptcy court). Shortly thereafter, respondent's investigation began. When contacted by respondent, petitioner was generally uncooperative. On April 17, 1989, Barnett Bank filed a proof of claim with the bankruptcy court, stating that petitioner was indebted to the bank in the amount of $ 4,002,214, and that the claim was subject to a setoff of $ 1,037,346 from deposits petitioner made and held at the bank. In February 1989, petitioner pled guilty to the following crimes and admitted the underlying facts contained in an information filed in the Circuit Court of the Tenth Judicial Circuit of the State of Florida, Polk County: (1) Organized fraud; (2) sale of unregistered securities; and (3) sale of securities by an unregistered dealer. The facts underlying the Florida State conviction included petitioner's obtaining over $ 50,000 from each of five or more victims. Specifically, petitioner pled *412 guilty to making false representations regarding the existence of certain oil and gas leases or projects. Pursuant to the State of Florida's civil proceeding against petitioner, in granting partial summary judgment for the State of Florida, the circuit court found the following facts: (1) Petitioner sold partial assignments of leases and production pool accounts to investors in Florida in the total amount of $ 125,535,578.71; (2) the leases and pool accounts were securities under Florida statutes; (3) none of the securities were registered by petitioner, in violation of Florida law; (4) neither petitioner nor S.H. Oil was registered with the Florida Department of Banking and Finance as a dealer in securities, in violation of Florida law; (5) petitioner employed a scheme to defraud, and he obtained money by untrue statements or by omitting material facts; (6) petitioner knowingly or willfully concealed information and presented false and forged AMOCO checks to investigators from the Florida Department of Banking and Finance. On March 2, 1989, petitioner pled guilty to the crimes and admitted the underlying facts contained in an information filed by the U.S. Attorney for the Middle *413 District of Florida. The information stated that, as part of petitioner's overall plan to defraud Barnett Bank: (1) Petitioner did knowingly and willfully devise a scheme to defraud Barnett Bank and to obtain money and assets by making false and fraudulent statements and representations; (2) petitioner made application for a line of credit from Barnett Bank in excess of $ 1 million; (3) petitioner made false and fraudulent statements and representations on financial statements submitted to Barnett Bank in order to influence Barnett Bank; (4) petitioner did cause Barnett Bank to distribute over $ 2 million to petitioner; (5) petitioner did draw $ 997,000 and $ 1,999,900 from the line of credit. Petitioner admitted these facts and pled guilty to the underlying criminal violation of 18 U.S.C. section 1344 (1988) (bank fraud). Petitioner claimed life insurance premium deductions of $ 216,453 and $ 282,127 in 1985 and 1986, respectively, and he claims, in his petition, that he incurred $ 415,979 for 1987. Petitioner's bankruptcy estate, his former wife, and his son were the beneficiaries of the insurance policies. OPINION Res Judicata
The *414 doctrine of res judicata prevents parties from relitigating the same claims or issues. Hemmings v. Commissioner, 104 T.C. 221, 230 (1995). Respondent asserts that, with respect to the collateral criminal and civil judgments, the issue preclusion aspects of the res judicata doctrine apply. [3] Specifically, respondent contends that the issues actually decided by the Federal and State convictions and State civil judgment should be given preclusive effect, and that petitioner should be collaterally estopped from denying the facts found by the U.S. District Court and the Florida circuit court. Petitioner argues, in contrast, that this Court should have an opportunity to decide the issues without regard to petitioner's collateral proceedings. *415 We must first decide whether issues resolved in petitioner's criminal plea agreements can be given preclusive effect. In Brazzell v. Adams, 493 F.2d 489, 490 (5th Cir. 1974), the U.S. Court of Appeals for the Fifth Circuit stated "that 'a fact decided in an earlier suit is conclusively established between . . . [the] parties and their privies, provided it was necessary to the result in the first suit'" (quoting Tomlinson v. Lefkowitz, 334 F.2d 262, 264 (5th Cir. 1964)). Moreover, a guilty plea is necessarily an admission of all the elements of a formal charge. McCarthy v. United States, 394 U.S. 459 (1969); Arctic Ice Cream Co. v. Commissioner, 43 T.C. 68 (1964). In the Federal criminal proceeding, petitioner pled guilty to defrauding Barnett Bank. In the State case, petitioner pled guilty to fraud, the sale of unregistered securities, and the sale of securities by an unregistered dealer. Each fact agreed to in the plea agreement was an essential element in petitioner's conviction for fraud. Petitioner's guilty pleas are judicial admissions of the fact that *416 he engaged in behavior designed to defraud. "There is no difference between a judgment of conviction based upon * * * [a guilty] plea and a judgment of conviction rendered after a trial on the merits." Arctic Ice Cream Co. v. Commissioner, supra at 75. Next, we must decide whether to give preclusive effect to the Federal and State convictions and State civil judgment. After the parties have had a "full and fair" opportunity to litigate, they may be estopped from relitigating the issues essential to the case. Parklane Hosiery Co. v. Shore, 439 U.S. 322, 332 (1979). This includes issues in a plea agreement. Arctic Ice Cream Co. v. Commissioner, supra.Furthermore, the use of nonmutual collateral estoppel may be permitted in appropriate circumstances. Blonder-Tongue Labs., Inc. v. University of Illinois Found., 402 U.S. 313, 350 (1971). In Montana v. United States, 440 U.S. 147, 155 (1979), the Supreme Court stated a three-part test for deciding whether the use of collateral estoppel is appropriate: First, whether the issues *417 presented in the subsequent litigation are substantially similar to those of the first proceeding; second, whether controlling facts or legal principles have changed significantly since the first judgment; and third, whether special circumstances warrant an exception to the normal rules of preclusion. For this purpose, we find a sufficient identity between the issues presented in the instant case and those involved in the prior criminal and civil litigation against petitioner. Moreover, the controlling facts and law have not changed since the entry of the civil judgment and criminal convictions against him. Finally, we find no unusual or special circumstances which would warrant deviating from the normal rules of preclusion. Hence, having found that petitioner had a "full and fair" opportunity to litigate the prior proceedings, we hold that petitioner is estopped from denying the facts necessary to support the civil judgment and criminal convictions against him. See Blanton v. Commissioner, 94 T.C. 491 (1990). [4]
*418 Unreported Income
Respondent determined that petitioner failed to report $ 5,065,081 in 1986 and $ 2,729,488 in 1987 from his oil and gas scheme. Petitioner has the burden of showing that respondent's determinations should not be sustained. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). In support of her findings, respondent relies on a detailed schedule of cash receipts and disbursements prepared by Deloitte. The accounting firm discovered that S.H. Oil had $ 35,049,257 of gross receipts from its lease and pool scheme during 1986, or $ 6,299,253 more than petitioner reported in 1986. Deloitte also found that petitioner's cost of sales (i.e., money returned) for that year was $ 26,540,132, which is $ 1,234,172 more than petitioner reported. In his 1987 return, petitioner included gross receipts of $ 65,606,397 and cost of sales of $ 69,103,056. Petitioner did not offer evidence to contradict or otherwise challenge respondent's determinations. Consequently, we accept the evidence that petitioner's net taxable income for 1986 was $ 5,065,081 greater than reported on his return for that year. Also regarding 1987, no evidence was offered *419 rebutting respondent's determinations. We hold that petitioner's cost of sales was $ 55,408,324 for 1987. Petitioner claims that he had an obligation to return the money he received from his investors. Therefore, petitioner believes that he is not required to recognize income on the funds which he believes were loans. In United States v. Rochelle, 384 F.2d 748, 751 (5th Cir. 1967), the U.S. Court of Appeals for the Fifth Circuit framed this issue as follows: When an individual secures money from many third parties by false representations, and when such funds constitute his sole source of support for several years, do these sums constitute taxable income, under section 61 of the Internal Revenue Code, notwithstanding the fact that the transactions are in the form of loans?
The court held that where such "loans are obtained by fraud, and where it is apparent that the recipient recognizes no obligation to repay, the transaction becomes a 'wrongful appropriation [and comes] within the broad sweep of "gross income"'." Id. (quoting James v. United States, 366 U.S. 213, 219 (1961)). In the instant case, petitioner's *420 ill-gotten gains were obtained by deceptive and fraudulent means. Through his oil and gas scheme, petitioner procured vast sums of money over which he had complete dominion and control. Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 431 (1955). This money was used by petitioner during the relevant years of the scheme. Consequently, we sustain respondent's determination that petitioner had unreported, taxable income from his S.H. Oil scheme during 1986 and 1987. Respondent also determined that, in 1985, petitioner failed to recognize $ 1 million of income from his Barnett Bank loans. Petitioner pled guilty to knowingly and willfully scheming to defraud the bank. The plea stated that petitioner obtained a $ 1 million line of credit at the bank by submitting false information. Petitioner received $ 1 million from Barnett Bank: $ 300 on March 28, 1985, and $ 999,700 on April 29, 1985. Respondent determined that this $ 1 million was taxable income to petitioner. Petitioner claims that this was a nontaxable loan. On February 25, 1986, petitioner reduced his outstanding $ 1 million loan balance to $ 50. One month later, petitioner repaid the remaining *421 $ 50 to Barnett Bank, reducing his loan balance to zero. On March 27, 1986, petitioner drew $ 100 from the credit line. Five days later, he obtained another $ 1,999,900, thus generating a loan balance of $ 2 million. By April 20, 1987, petitioner had, once again, reduced his loan balance to zero; however, on the same day, he obtained $ 3 million from the Barnett Bank credit line. Petitioner engaged in a pattern of borrowing and repaying Barnett Bank. After he made repayment, petitioner was able to borrow even more funds (i.e., $ 3 million by 1987). Petitioner intended to defraud Barnett Bank in 1985, when he obtained the initial $ 1 million line of credit. We find that his intent to defraud the bank is established by his plea agreement and criminal conviction in the Federal case, and is reflected in his consistent pattern of borrowing and repaying funds. [5] Moreover, petitioner had no legitimate way to pay Barnett Bank, thus showing that he did not intend to repay them from the beginning. See James v. United States, supra; Breckenridge v. Commissioner, T.C. Memo. 1983-66. We find that petitioner's periodic payments *422 to reduce his credit line balance were "[expenses] of perpetrating and concealing the fraud * * * [that he was] perpetrating." McSpadden v. Commissioner, 50 T.C. 478, 489 (1968). Petitioner ultimately borrowed $ 3 million, leaving Barnett Bank to file a claim with the bankruptcy court where petitioner's case was pending. This was a consequence of petitioner's overall scheme relating back to the original $ 1 million, similar to kiting one's deposits to cover his or her obligations. Accordingly, we find that the $ 1 million petitioner initially obtained from Barnett Bank in 1985 was taxable income. Life Insurance Premium Expenses
*423 Petitioner incurred life insurance premium expenses in connection with policies that he held for the benefit of his estate, his former wife, and his son. Respondent disallowed the deductions, arguing that such expenses were nondeductible because they were incurred for personal, living, or family reasons. Sec. 262. Section 262 prohibits deductions for personal expenses. Section 264(a)(1) disallows a deduction for insurance Premiums paid on any life insurance policy covering the life of any officer or employee, or of any person financially interested in any trade or business carried on by the taxpayer, when the taxpayer is directly or indirectly a beneficiary under such policy.
To the extent that the insurance policies were for the benefit of petitioner or his estate, section 264(a)(1) prohibits a deduction. See Rodney v. Commissioner, 53 T.C. 287, 318-319 (1969). In Guglielmetti v. Commissioner, 35 T.C. 668, 670-673 (1961), no deduction was allowed for the premiums paid on a life insurance policy taken out on the life of the owner of a sole proprietorship where the proceeds on the policy were payable to the *424 wife of the taxpayer-owner. Payment of these premiums was held to be a purely personal expense, rather than an ordinary and necessary business expense. Id.[6] The same is true here. Petitioner has not shown that he incurred insurance expenses for any purpose other than a personal one. Payments to John Curry
Petitioner claimed deductions for payments that he made to John Curry: $ 32,500 in 1985, $ 147,500 in 1986, and $ 553,500 in 1987. He argues that these payments to Mr. Curry or to the Consulting Group, Inc., were for bona fide consulting services. Respondent disallowed the deductions, finding that these payments were not consulting fees; rather, respondent asserts that, if the payments were made, they were for nondeductible purposes. The only significant evidence regarding the nature of any payments to Mr. Curry is a letter from Mr. Curry to petitioner, dated May 15, 1986. In this letter, Mr. Curry does not detail *425 the type of services that he would perform for petitioner. He merely explains to petitioner that, upon his payment to Mr. Curry, petitioner could take a deduction. Mr. Curry then explains that petitioner would be repaid the fees in Bermuda, at a tax-free, 50-percent interest rate. This by no means suggests a bona fide, deductible expense. Petitioner has failed to meet his burden, inasmuch as he has presented the Court with no evidence that his payments, if any, to Mr. Curry are deductible. Rule 142(a). Fraud
Respondent asserted that part of the deficiency in petitioner's income tax for each of the years 1985 and 1986 is due to fraud. [7]With respect to the addition to tax for fraud, the burden of proof is on respondent, and must be carried by clear and convincing evidence. Sec. 7454(a); Rule 142(b). To meet her burden, respondent must show that petitioner intended to evade tax known to be due by concealing, misleading, or otherwise preventing tax collection. Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983). Respondent must show (1) that there is an underpayment of tax, and (2) that such underpayment is attributable to fraud. Hebrank v. Commissioner, 81 T.C. 640, 642 (1983). *426 We have found that there were underpayments of tax in both 1985 and 1986. We are satisfied that respondent has carried her burden in that respect. We must now decide if the underpayments were attributable to fraud. Id.
*427 Fraudulent intent is seldom proven by direct evidence; however, we have found, based on petitioner's criminal convictions, that he intended to defraud his investors and Barnett Bank. We must now decide whether petitioner fraudulently intended to evade Federal income tax. Absent direct evidence of such an intent, we must look to indirect evidence in determining whether or not fraudulent intent was associated with a taxable year. Spies v. United States, 317 U.S. 492 (1943); Rowlee v. Commissioner, supra. Petitioner's conduct may be such evidence. Stone v. Commissioner, 56 T.C. 213, 224 (1971). Courts have also looked to "badges of fraud" as indicia of fraudulent intent. Examples of these badges of fraud include: (1) Understating income; (2) keeping inadequate records; (3) having implausible or inconsistent explanations of behavior; (4) concealing assets; (5) failing to cooperate with tax authorities; (6) engaging in illegal activities; (7) creating false documents or records; (8) dealing in cash; and (9) overstating deductions. Bradford v. Commissioner, 796 F.2d 303 (9th Cir. 1986), *428 affg. T.C. Memo. 1984-601; Meier v. Commissioner, 91 T.C. 273, 297-298 (1988); Estate of Temple v. Commissioner, 67 T.C. 143, 161 (1976). Through petitioner's tax returns, and with schedules prepared by independent certified public accountants, respondent has proven that petitioner understated his income in each of the years at issue. Petitioner's failure to report this income resulted in sizable understatements of income on petitioner's 1985, 1986, and 1987 tax returns. "Repeated understatements in successive years when coupled with other circumstances showing an intent to conceal or misstate taxable income present a basis on which the Tax Court may properly infer fraud." Anderson v. Commissioner, 250 F.2d 242, 250 (5th Cir. 1957), affg. T.C. Memo. 1956-178. We find that there are such other circumstances showing an intent to conceal. See Bradford v. Commissioner, supra. Throughout respondent's examination and throughout this proceeding, petitioner did not produce any records substantiating his sources *429 or amounts of income. We do know that, based on petitioner's own admissions, a great deal of income was derived from a fraudulent and illegal oil and gas investment scheme. Similarly, petitioner attempted to deceive a financial investigator from the State of Florida with falsified checks. The records that petitioner did show to respondent's revenue agent were primarily fraudulent and false, created in order to obtain access to a credit line at Barnett Bank. Petitioner's records omitted a substantial part of his income, and they did not substantiate many of his claimed deductions. Consequently, petitioner failed to maintain adequate and reliable records. In his 1985 and 1986 tax returns, petitioner specifically denied that he owned bank accounts in Bermuda by answering "no" to the foreign bank account questions. He claimed that he did not maintain any interest in a foreign account; however, we have found that he did have such an interest with Butterfield Bank in Bermuda. Thus, we find that, through the answers to these questions on Schedule B, petitioner attempted to conceal assets from respondent. Furthermore, petitioner was generally uncooperative during respondent's investigation. *430 Petitioner admittedly participated in illegal conduct, maintained a consistent pattern of understating his income and overstating his deductions, and participated in other activities intended to defeat the collection of his taxes, which constitute badges of fraud. Thus, we find that respondent has proven by clear and convincing evidence that petitioner fraudulently intended to evade income tax in 1985 and 1986. Hence, petitioner is liable for the additions to tax for fraud for 1985 and 1986. Negligence
Respondent determined that, for 1987, petitioner is liable for the additions to tax for negligence or intentional disregard of rules or regulations under section 6653(a)(1) and (2). Petitioner has the burden of proving that he was not negligent. Rule 142(a); Bixby v. Commissioner, 58 T.C. 757, 791 (1972). Negligence under section 6653(a) is defined as the "lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances." Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967), affg. in part and remanding in part 43 T.C. 168 (1964) and *431 T.C. Memo. 1964-299. Petitioner omitted several million dollars of income from his 1987 tax return. Moreover, he claimed, without substantiation, a large deduction for payments alledgedly made to Mr. Curry. Petitioner failed to file his 1987 return until after respondent issued a notice of deficiency, over 2 years after the due date of the tax return. Petitioner's conduct was, at the very least, negligent with respect to his 1987 tax year. Marcello v. Commissioner, supra; Emmons v. Commissioner, 92 T.C. 342, 349-350 (1989), affd. 898 F.2d 50 (5th Cir. 1990). Accordingly, the additions to tax under section 6653(a)(1) and (2) are sustained. Substantial Understatement of Income Tax
Respondent determined that petitioner is liable for additions to tax under section 6661 for substantially understating his income tax for each of the years in issue. Income tax is substantially understated if, in any year, the amount of the understatement exceeds the greater of 10 percent of the tax required to be shown on the return for the taxable year, or $ 5,000. Sec. 6661(b)(1)(A). *432 The understatement is reduced for that portion for which there is "substantial authority" or adequate disclosure. Sec. 6661(b)(2)(B). Petitioner has failed to cite any authority supporting his understatements. For 1985, 1986, and 1987, petitioner omitted millions of dollars from income. Petitioner has not shown substantial authority for his positions, nor has he adequately disclosed his positions. Accordingly, if his income tax understatements are substantial within the meaning of section 6661(b)(1)(A), then he is liable for the addition to tax under section 6661(a) for each year in issue. Decisions will be entered under Rule 155.
Footnotes
1. These cases were originally consolidated with those of petitioner's former wife, Heather M. Smith, at docket Nos. 30366-89 and 18165-92. Pursuant to respondent's Motion to Sever, filed Oct. 8, 1993, the Court ordered that Heather M. Smith's cases be severed from those of petitioner Stephen L. Smith.↩
1. 50 percent of the interest due on $ 3,670,542.↩
2. 50 percent of the interest due on $ 770,277.↩
1. 50 percent of the interest due on $ 1,499,513.↩
2. The parties have stipulated facts and documents that are incorporated by this reference.↩
3. The principles of res judicata include both claim preclusion and issue preclusion. Direct estoppel and collateral estoppel are the issue preclusion aspects of this doctrine. Migra v. Warren City School Dist., 465 U.S. 75, 77 n.1 (1984); Kaspar Wire Works, Inc. v. Leco Engg. & Mach., 575 F.2d. 530, 535-536 (5th Cir. 1978); Hemmings v. Commissioner, 104 T.C. 221, 231↩ (1995).
4. Parklane Hosiery Co. v. Shore, 439 U.S. 322 (1979); see also Stogniew v. McQueen, 20 Fla. Law W. S208 (Fla., May 4, 1995) (subject to rehearing motion); Zeidwig v. Ward, 548 So. 2d 209↩ (Fla. 1989) (approving the use of nonmutual, defensive collateral estoppel to prevent a defendant from relitigating issues from a prior criminal proceeding).
5. See O'Sheeran v. Commissioner, T.C. Memo. 1983-702↩ (repaying sums of money does not recognize a loan obligation; instead, it is the best way to maintain cash-flow from those who demand repayment). In the instant case, petitioner was able to obtain greater amounts of cash from Barnett Bank by establishing an "ability" to repay.
6. See also Brock v. Commissioner, T.C. Memo. 1982-335↩.
7. For 1985, if respondent proves that any part of the underpayment is due to fraud, then the 50-percent addition to tax applies to the entire underpayment. Sec. 6653(b)(1). Sec. 6653(b)(2) imposes a further addition to tax of 50 percent of the interest due with respect to the portion of the underpayment attributable to fraud. For 1986, a 75-percent addition to tax applies to that portion of the underpayment attributable to fraud. Sec. 6653(b)(1)(A). If respondent establishes that any portion is due to fraud, then the entire underpayment is treated as attributable to fraud, except for that portion that petitioner establishes is not due to fraud. Sec. 6653(b)(2). Sec. 6653(b)(1)(B)↩ imposes a further addition to tax of 50 percent of the interest payable with respect to the portion of the underpayment attributable to fraud.